**APACHE BEND APARTMENTS, LTD., et al.**

v.

**UNITED STATES of America, et al.**

Civ. A. No. 4–86–815–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

Sept. 8, 1988.

Patrick A. Barbolla, Fort Worth, Tex., for Apache Bend Apartments, Ltd., et al.

Michael E. Greene, Atty., Tax Div., Louise P. Hitken, Dept. of Justice, Dallas, Tex., for U.S., et al.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

Now before the Court are the cross motions for summary judgment of the parties in the above-styled case. The Court held a hearing in this case on August 6, 1987. After a thorough review of the motions, the briefs, the oral arguments, and the applicable law, the Court makes the following determinations.

### FACTS

This action challenges the constitutionality of the Tax Reform Act of 1986. Plaintiffs seek a judicial determination that the 1986 Act violates both the Uniformity Clause of Article 1, section 8 of the United States Constitution and the equal protection component of the Due Process Clause of the Fifth Amendment of the United States Constitution. Plaintiffs also seek a permanent injunction preventing enforcement of the 1986 Tax Act.

Plaintiff Patrick A. Barbollo, P.C., is a Texas professional corporation which is subject to the provisions of the Internal Revenue Code that applies to corporations, including the corporate alternative minimum tax. This corporation has, and will in the future, purchase tangible personal property.

Section 701 of the 1986 Tax Act increased the alternative minimum tax for corporations by mandating that such tax be increased by 50% of the excess by which a corporation's "net book income exceeds the alternative minimum taxable income...." One exception to this rule is provided in section 703(b), which negates the book income increase for a corporation "incorporated in Delaware on May 31, 1912." Control Data Corporation is the sole entity to which this exclusion applies, and the benefit to Control Data is $25,000,000.00. 132 Cong.Rec. S13,912 (daily ed. Sept. 27, 1986) & 132 Cong.Rec. S13,884 (daily ed. Sept. 27, 1986) (Remarks by Senator DeConcini). While Control Data Corporation receives a benefit of $25,000,000.00, other corporations will have their alternative minimum taxes increased by an aggregate of $22,000,000,000.00. II, *Conference Report to Accompany H.R. 3838: Tax Reform Act of 1986.* H.R. Doc. 99–841, 99th Cong. 2d Sess. II–883 (1986) [herein after cited as "Conference Report"]. Plaintiff Corporation is one of the corporations that will be affected by the provisions for adjustments for book income in the 1986 Act. Plaintiff Corporation will be taxed at a different rate than Control Data Corporation since Control Data is not subject to the same alternative minimum tax rules.

In addition, Plaintiff Patrick A. Barbolla, P.C., has in the past and will in the future, purchase items of tangible personal property which were subject to Investment Tax Credits under prior tax laws but will not be eligible for Investment Tax Credit under the Tax Reform Act of 1986. Section 211

of the Tax Reform Act repeals the regular investment tax credit. However, Section 211(e)(4) exempts two companies from the repeal of Investment Tax Credits, one of which is the General Motors Corporation. It will receive $70 million in tax credit for its Saturn plant. 132 Cong.Rec. S13,914 (daily ed. Sept. 27, 1986). The other company cannot be identified from the Tax Act or the legislative history.[1]

Plaintiff Western Oaks Apartments, Ltd. is a limited partnership formed under the laws of the State of Texas. Plaintiff Western Oaks intends to construct an apartment complex in the City of Red Oak. To that end and prior to October 22, 1986, it has incurred contractual obligations for architectural fees, executed a land option contract to purchase realty and will be owning depreciable property placed in service subsequent to December 31, 1986. The depreciation schedule for the apartment complex which Western Oaks will own has been extended under the 1986 Act. However, sections 204 and 251 have exempted several taxpayers from the new depreciation schedules, such entities will be able to use the favorable schedules which existed under the old tax laws.

Plaintiff Western is also subject to the "at risk" rules under section 503 since these rules were extended to all real estate property under the 1986 Act. However, the "at risk" rules were not extended to one real estate project under section 503(c)(2)—Three River Stadium in Pittsburgh, Pennsylvania.

Plaintiff Apache Bend Apartments, Ltd. is a limited partnership formed under the laws of the State of Texas. In July 1986, Plaintiff Apache Bend placed in service its apartment complex for lower income families in Sweetwater, Texas. This apartment complex was financed by means of a long term loan from the Farmers Home Administration, United States Department of Agriculture. The 1986 Act does not allow Plaintiff Apache Bend to obtain the low income housing tax credit. However, Section 252(f)(3) of the Act allows seven other low income housing complexes in Texas, which were placed in service prior to January 1, 1987, to receive the low income housing tax credit.

As the owner of the apartment complex, Apache Bend is also subject to the "at risk" rules under section 503 since these rules were extended to all real estate property under the 1986 Act. As stated above, the "at risk" rules do not apply to one real estate project—Three River Stadium.

Lastly, Patrick A. Barbolla, individually, sold an interest in a partnership ("capital asset") in 1984. Barbolla purchased the capital asset more than one year prior to the sale. The sale required periodic payments for the years 1985 through 1990. The maximum tax for which Barbolla could be liable under the old capital gains rules is far less than the maximum tax that Barbolla could be liable for under the new capital gains rules. Barbolla objects that the two limited partners of a limited partnership which owned Cimarron Coal Company are exempt from the new capital gains rules under section 302(c) of the new Act. These are the only taxpayers who are exempt from the new capital gains rules.

## LEGISLATIVE HISTORY OF THE 1986 TAX ACT

The special exceptions to the new tax law are labeled "transition rules." The legislative history of the new act contains a plethora of discussions by the members of Congress about the transition rules.

Members of the House of Representatives stated that the new Act did not effect similarly situated people in the same manner. For example, Representative Kolbe stated:

> There are literally hundreds of special transition rules included in this bill which are really nothing more than gifts of immunity from the adverse changes brought on by the bill given to individuals and corporations who were fortunate

---

**1.** The company other than General Motors which receives the investment tax credit is identified as "any continuous caster facility for slabs and blooms which is subject to a lease and which is part of a project the second phase of which is a continuous slab caster which was placed in service before December 31, 1935." Section 211(e)(4)(A)—Tax Reform Act.

to have an ear in Congress. To tell my constituents that they are going to lose the benefits of the rental property investment or retirement plans they made, while other individuals or corporations will receive special consideration flies in the face of fairness.

132 Cong.Rec. H8,389–90 (daily ed. Sept. 25, 1986).

Members of the Senate shared the same concern, namely, that similarly situated taxpayers were not treated equally because of the transition rules. For instance, Senator Levin of Michigan stated:

[A] transition rule is nothing less than a tax break for a special company; the rule prevents some specific provisions of the legislation from applying to it. Some of these tax breaks are justified; they soften the blow of the new law on businesses that undertook projects under the current tax law, only to be told the rules would be changed in the middle of the game. However, what concerns me is that many individuals and businesses are in the same sort of position and are subject to the same change in the rules, yet only a few of them were able to get a special exception in the law to take into account their particular case.

132 Cong.Rec. S8,128 (daily ed. June 23, 1986).

The Senate Finance Committee was the senatorial committee responsible for drafting the new tax law. Members of the committee used their position on the committee to obtain special exceptions or "transition rules" for their constituents. For instance, only a few taxpayers in the whole country escaped the repeal of capital gain exclusion for individuals for sale proceeds of a capital asset. The individuals who received this exclusion were limited partners in a partnership which owns Cimarron Coal Company.

Cimarron got taken care of because they came to the distinguished Senator from Colorado (Senator Armstrong), a member of that committee. They made their case. He took it to the committee. Many others lacked access to the committee and they were left out in the cold.

Cong.Rec. S7,654 (daily ed. June 17, 1986) (Remarks of Senator Metzenbaum). One member of the Senate Finance Committee, Senator Durenberger, admitted using his position on the committee to obtain special treatment for his constituents.

I do not mind saying to my colleagues that I have used my position on the Finance Committee to the advantage of the people of Minnesota. . . . I have used my position to get special rules for my people. . . .

132 Cong.Rec. S8,221 (daily ed. June 24, 1986).

The question arises as to how it was determined which taxpayers receive transition rules. After the House–Senate Conference reached agreement on the bill, Senators Packwood and Representative Rostenkowski selected specific projects for the transition rules. The Senate and House Committees gave these congressmen authority to allocate special exceptions or transition rules to taxpayers whose names were presented to the congressmen from members of Congress. Senator Packwood explained the process by which he and Representative Rostenkowski selected the taxpayers who would receive transition rules.

First, the Chairman of the Ways and Means Committee and I set down some specific guidelines that transition rules could not violate. They could not be exceptions to the book income provisions of the corporate minimum tax. None of them are. They could not violate the passive loss provisions that the Senate had in its bill. None of them do.

On the very last night . . . we made the only exception to the passive loss rules. It was not one project. It was in the area of low-income housing. . . .

There were four or five other basic principles that [we] . . . agreed the transition rules must not violate. By and large, the transition rules adhere to these principles.

There are, however, about 380 transitions, what I call rifle shot transitions, that are in the conference agreement

that were not in the Senate bill and were not in the House bill.

There will be criticism, I know. Who is to say which project deserves a transition. Those are subjective judgments.

It would be foolish of me to say that, on occasion, politics did not enter those judgments. If the Speaker of the House requested from the chairman of the Ways and Means Committee a transition rule, my hunch is that the chairman of the Ways and Means Committee would give it a reasonably high priority in his thinking.

If Senator Dole requested one of me, I would give it a reasonably high priority in my thinking.

But, Mr. President, as honestly as we could, we tried to be fair in the transitions and we tried to make sure that they did not violate the basic tenets of the bill.

132 Cong.Rec. S13,786 (daily ed. September 26, 1986)

Thus, the evidence before the Court indicates that the House and the Senate passed a tax bill which contained several transition rules. After that, the House and Senate committee worked to compromise on the differences between the two bills. Part of this process include the evaluation of several candidates for transition rules. Senator Packwood and Representative Rostenkowski evaluated the requests and the ones that these two Congressmen thought were valid were inserted into the modified bill that went to the House and Senate for approval. This Court notes that the members of the House of Representatives did not even know what taxpayers were getting transition rules when they voted for the 1986 Tax Act. 132 Cong.Rec. S13,782 (daily ed. Sept. 26, 1986) (remarks of Senator Metzenbaum).

Senator Levin from Michigan accurately summarizes Plaintiffs' objections to the new tax law.

The retroactivity of certain provisions of this bill has given rise to another unfairness. Tens of millions of Americans will be affected by these retroactive changes. But hundreds of corporations and projects will not, because they had access to the conference committee which enabled them to obtain a so-called transition rule so that their activity could continue to be taxed under the old law. Let me make clear that as a matter of substance I am willing to acknowledge that many of these transition rules are justified in that they prevent the rules from being changed in the middle of the game for certain specific businesses and projects.

The problem is that for every one of the 650 for whom there is a special rule, there could be thousands of similarly situated for whom there is only the cold glare of retroactivity. According to the matter response which I just received from the Finance Committee, "It is impossible to quantify the number of businesses or individuals who do not have transition rules but are in a situation similar to those businesses or individuals covered by rules in the conference report. However, it is fair to say that we tried to provide equal treatment wherever possible for meritorious cases, within our budget constraints, based on the submissions we received from Members of the Senate and House of Representatives." But I ask, what about those who could not come to Washington and make their case? What about those who could not hire the lobbyists to present their appeal? Where is the fairness for them?

132 Cong.Rec. S13810 (daily ed. Sept. 26, 1986).

## DISCUSSION

Article III of the Constitution limits the "judicial power" of the United States to the resolution of "cases" and "controversies." *Valley Forge College v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). The "case" and "controversy" requirements embody "two complimentary but somewhat different limitations." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). First, federal courts can only adjudicate the legal rights of litigants who are in controversy. *Id.* (*quoting Liverpool S.S. Co. v. Comm. of Emigration*, 113 U.S.

33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885)). This is the means by which the judiciary has traditionally entertained issues. *Flast*, 392 U.S. at 95, 88 S.Ct. at 1949. In addition, the separation of powers between the three branches of the federal government was not structured so that the judiciary would have an unbridled right to examine the constitutionality of actions by the other branches of government. *Valley Forge*, 454 U.S. at 471, 102 S.Ct. at 757. The "cases" and "controversy" limitation "assures that the federal courts will not intrude into areas committed to the other branches of government." *Flast*, 392 U.S. at 95, 88 S.Ct. at 1956. The federal courts will make such an intrusion only if it is a "necessity in the determination of real, earnest and vital controversy." *Id.* (quoting *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892)).

■ The Federal Judiciary has taken great pains to recognize these constraints upon it through the use of the justiciability principles embodied in the case and controversy doctrine. A suit is not justiciable if there is no standing, if the case presents a political question, if the parties seek an advisory opinion, or if the suit is moot. *Id.* The Court will examine the issues of standing and the political question doctrine as they apply to this case.

## I. Standing

### A. *General Standing*

■ Standing is a principle by which a Court determines whether the person seeking relief in a judicial proceeding is a person who can seek such relief. Only the proper party can request a federal court to adjudicate a case. *Flast*, 392 U.S. at 100, 88 S.Ct. at 1952. Whether a party has standing is unrelated to whether the issue the party seeks to have adjudicated is justiciable. *Id.*[2]

"[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision,' *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976)." *Id.* 454 U.S. at 472, 102 S.Ct. at 758.

This Court finds that Plaintiffs have satisfied the first criteria: namely, they have suffered some threatened injury because of the alleged illegal enactment. Plaintiff Patrick A. Barbollo, P.C., is a corporation which is subject to the increase in the alternate minimum tax. This increased tax is a threatened injury. Plaintiff Corporation also cannot take advantage of the investment tax credits. The loss of opportunity to obtain an investment tax credit is a threatened injury.

The partners in Western Oaks Apartments, Ltd.[3] will be subject to the depreciation schedules and the "at risk" rules enacted under the 1986 Tax Act. Some taxpayers are permitted to use the more favorable depreciation schedules under the old tax laws. In addition, one piece of real estate will not be subject to the "at risk" rules. This distinction between the tax laws which apply to the partners in Western and the tax laws which apply to other taxpayers puts the partners in Western at a disadvantage and creates a threatened injury.

**2.** "Thus, a party may have standing in a particular case, but the federal court may nevertheless decline to pass on the merits of the case because, for example, it presents a political question." *Flast*, 392 U.S. at 100, 88 S.Ct. at 1952.

**3.** The Government contends that the two limited partnerships which are plaintiffs in this case do not have standing to bring this suit because the limited partnerships are not taxpayers. The partners in the limited partnerships are the taxpayers. This Court agrees that the real party in interest are the partners in the limited partnerships. Pursuant to Rule 17(a) of the Federal Rules of Civil Procedure, the Court permits the partners in the limited partnerships to be substituted for the limited partnerships as plaintiffs. Plaintiffs shall make this substitution within 30 days from the date of this opinion.

The partners in Apache Bend Apartments, Ltd. owns a low income housing complex. The partners in Apache are not able to obtain a low income housing tax credit under the 1986 Act. However, other low income housing complexes are able to receive such tax credits under the Act. The fact that other taxpayers receive a benefit (tax credit) which the partners in Apache do not is a threatened injury to the partners. The partners also experience a threatened injury because of the "at risk" rules.

Plaintiff Patrick A. Barbolla, individually, sold a capital asset. The gain realized from that sale is taxed at a higher rate under the 1986 Tax Act than it was under the old tax law. Another taxpayer is not subject to the new capital gains rules. The fact that Patrick A. Barbolla's capital gain will be taxed at a higher rate than another taxpayer is a threatened injury to Barbolla.

As to the second criteria for standing, it is clear that the alleged injury to the Plaintiffs is directly traceable to the 1986 Tax Act. It is this Act which creates the distinctions in tax treatment between the Plaintiffs and other taxpayers.

As to the third criteria, if this Court grants an injunction prohibiting the enforcement of the transition rules in the 1986 Tax Act, then all taxpayers will be treated uniformly under the Act. Therefore, the relief requested can redress the inequality that Plaintiffs seek to abolish.

In sum, the Court finds that Plaintiffs have standing to bring this suit under the general standing principles.

#### B. *Taxpayer Standing*

■ A federal taxpayer may have standing to challenge an allegedly unconstitutional federal taxing program if he has a sufficient personal stake in the controversy. A plaintiff has the requisite personal stake to sue in his capacity as a taxpayer if two criteria are met. "First, the taxpayer must establish a logical link between that status [as a taxpayer] and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of

congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution." *Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). Plaintiffs satisfy this requirement since they are challenging an enactment of Congress; namely the 1986 Tax Act. In addition, Plaintiffs are challenging the Congressional "exercise of authority conferred by the Taxing and Spending Clause of Art. I, § 8" *Valley Forge College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 480, 102 S.Ct. 752, 762, 70 L.Ed.2d 700 (1982) since the Tax Act was enacted pursuant to Congress' power under this provision of the Constitution.

"Secondly, the taxpayer must establish a nexus between that status [as a taxpayer] and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." *Id.*

The Government contends that the Uniformity Clause is not a "constitutional limitation" on Congress's power to tax, but rather a mere "regulation" of Congress's power to tax. In support of its contention, the Government cites *Brushaber v. Union Pacific Railroad Co.,* 240 U.S. 1, 13, 36 S.Ct. 236, 240, 60 L.Ed. 493 (1916) which states

'In the matter of taxation, the Constitution recognizes the two great classes of direct and indirect taxes, and lays down two rules by which their imposition must be governed, namely: The rule of apportionment as to direct taxes, and the rule of uniformity as to duties, imposts, and excises.' It is to be observed, however, as long ago pointed out ... that the requirements of apportionment as to one of the great classes [direct taxes] and of uniformity as to the other class [indirect taxes] were not so much a *limitation* upon the complete and all-embracing authority to tax, but in their essence were

simply *regulations* concerning the mode in which the plenary power was to be exerted. (emphasis added)

The fact that the Supreme Court in 1916 categorized the Uniformity Clause as a regulation does not convince this Court that the Uniformity Clause is not also a limitation as the Supreme Court used the word in *Flast*.[4] The Uniformity Clause restricts the method by which the Congress can assess taxes. Thus, it is a limitation on the means by which Congress can tax. This view of the Uniformity Clause is consistent with other Supreme Court decisions. *United States v. Ptasynski*, 462 U.S. 74, 80, 103 S.Ct. 2239, 2242, 76 L.Ed.2d 427 (1983) ("The Uniformity Clause conditions Congress' power to impose indirect taxes."); *Flint v. Stone Tracy Co.*, 220 U.S. 107, 150, 31 S.Ct. 342, 348, 55 L.Ed. 389 (1911) (the Uniformity Clause allows Congress "to lay and collect ... taxes, duties, imposts and excises, upon which the limitation is that they shall be uniform throughout the United States"); *Knowlton v. Moore*, 178 U.S. 41, 85, 20 S.Ct. 747, 765, 44 L.Ed. 969 (1900) ("The tax imposed upon the distiller is in the nature of an excise, and the only limitation upon the power of Congress in the imposition of taxes of this character is that they shall be uniform throughout the United States.")

The Plaintiffs have alleged in their complaint that the 1986 Tax Act exceeds the limitations found in the Uniformity Clause.[5] Therefore, they have met the requirements of the second nexus for federal taxpayer standing.

In sum, the Court finds that the plaintiffs have standing both under the general principles and as federal taxpayers.

As to Plaintiffs' claim for equal protection of the laws within the meaning of due process under the Fifth Amendment, this Court finds that the second nexus of the *Flast* test is not met since the Fifth Amendment is not a limitation of the taxing and spending power granted in Art. 1, § 8.

II. Political Question

■ Now that the Court has determined that Plaintiffs have standing to bring this suit, the question next becomes whether the substance of the suit involves a question to which this Court can address itself. The Government contends that the granting of transition rules to a few taxpayers is a right which is vested in the Legislature and review of that decision is not permitted by the Judiciary. The Government's argument follows that since this power is exclusively vested in the Legislature, it involves a "political question" and, therefore, is nonjusticiable.

The Supreme Court presented a thoughtful review of the "political question" doctrine in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The Court articulated several areas in which the doctrine has been invoked: foreign relations, dates of duration of hostilities, formalities of congressional enactments, status of Indian tribes, and claims under the Republican form of government clause. *Id.* at 211–19, 82 S.Ct. at 706–11. The Court also identified some of the common principles which

4. The Court's logic in *Flast* also refutes the Government's contention. One could have argued in *Flast* that the Establishment Clause is a "regulation" of the way that Congress could exercise its spending powers. The argument would follow that because the Establishment Clause only regulates the way that Congress can spend revenue, it is not a limitation on Congress' right under Art. 1, § 8 to spend revenue. This argument obviously failed in *Flast* just as a legally indistinguishable argument must fail in this case.

5. The Supreme Court, in *Flast,* stated that the Plaintiff must "show" that the challenged enactment exceeds constitutional limitations. The

Plaintiff does not have to "show" in terms of presenting evidence in order to have standing. The Plaintiff needs to allege in its complaint that the challenged enactment exceeds constitutional limitations. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

In *Flast,* the major issue which the Supreme Court considered was whether the Establishment Clause was a limitation upon the spending power of Congress. The issue in this case is much easier. The Uniformity Clause is within the same section of the Constitution as the Taxing and Spending Clause and clearly limits the manner in which Congress can impose a tax.

supported the invocation of the political question doctrine to avoid a judicial determination. "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.* at 217, 82 S.Ct. at 710.

The Government argues that there is a "textually demonstrable constitutional commitment" of the power to tax to the Legislature. This Court agrees. However, Plaintiffs are not questioning the Legislature's power to tax. Plaintiffs are challenging the manner in which the Legislature has exercised that power. There is no constitutional commitment to the Legislature for determining the constitutionality of the way it exercises its power. *Cf. Powell v. McCormack,* 395 U.S. 486, 520, 89 S.Ct. 1944, 1963, 23 L.Ed.2d 491 (1969).

As the Supreme Court stated in a markedly similar case: The plenary authority of Congress over aliens under Art. I, § 8, cl. 4, is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power. As we made clear in *Buckley v. Valeo,* 424 U.S. 1 [96 S.Ct. 612, 46 L.Ed.2d 659] (1976): 'Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, *McCulloch v. Maryland,* [17 U.S.] 4 Wheat. 316 [4 L.Ed. 579] (1819), so long as the exercise of that authority does not offend some oth-

er constitutional restriction.' 424 U.S. at 132 [96 S.Ct. at 688].

*I.N.S. v. Chadha,* 462 U.S. 919, 940, 103 S.Ct. 2764, 2778, 77 L.Ed.2d 317 (1983). *See also, Olegario v. United States,* 629 F.2d 204, 217 (2d Cir.1980) (constitutionality of congressional enactment not committed exclusively to one branch).

The Government also contends that the granting of the transition rules to some taxpayers requires initial policy decisions which are not for judicial discretion. The policy reasons behind the granting of the transition rules is not an area into which this Court need embark to decide this case. This Court is unaware of any policy decision [6] which needs to be made by the Legislature before this Court decides the constitutionality of the transition rules. *See e.g., Armstrong v. United States,* 759 F.2d 1378, 1380 (9th Cir.1985) (judiciary is able to decide constitutionality of revenue law without delving into internal working of Congress). *But see, Texas Ass'n of Concerned Taxpayers, Inc. v. United States,* 772 F.2d 163 (5th Cir.1985) (disagreed with Ninth Circuit on ultimate issue of justiciability).

The Government boldly asserts, without further elaboration, that the four other reasons for invoking the political question doctrine also apply in this case. This Court disagrees. The Uniformity Clause of Art. I, § 8 and the Equal Protection Doctrine under the 5th Amendment and the case law which has evolved from these provision provides ample standards for the Court to decide this case. *Pangilinan v. I.N.S.,* 796 F.2d 1091, 1096 (9th Cir.1986) (judicial standards of equal protection are well developed). Neither the Executive Branch nor the Legislative Branch have decided, nor do they have the authority to decide, the constitutionality of the transition rules. *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 176, 2 L.Ed. 60 (1803). Therefore, there is no need for the Court to adhere to such a decision.[7] For the same reasons, the Unit-

---

**6.** In addition, the Government has not articulated any policy decision.

**7.** This factor is often important when a court is considering an issue that impacts on foreign affairs. *Oneida v. Oneida Indian Nation,* 470 U.S. 226, 250, 105 S.Ct. 1245, 1259, 84 L.Ed.2d

**1294**

ed States could not be embarrassed by "multifarious pronouncements by various departments on one question." The Court's evaluation of the constitutionality of the transition rules does not show a lack of respect for the legislative branch. Courts are obligated to evaluate the constitutionality of legislative enactments. *Olegario*, 629 F.2d at 218 (citing *Matter of Naturalization of 68 Filipino War Veterans*, 406 F.Supp. 931 (N.D.Ca.1975)).

In sum, it is the duty of the Judiciary to analyze the constitutionality of congressional enactments. *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 176, 2 L.Ed. 60 (1803). None of the above considerations suggest that this Court should shrink from its duty.[8] Consequently, the Court finds that the narrow political question doctrine does not prevent consideration of the merits in this case.

III. Anti–Injunction Act: 26 U.S.C. § 7421(a)

The Federal Courts' ability to adjudicate a case is also constrained by congressional enactments which limit the jurisdiction of the courts. One such limitation is the Anti–Injunction Act. This provisions states, in relevant part:

> (a) Tax.— ... no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

26 U.S.C. § 7421(a). Stated simply, the Act prohibits suits which seek to restrain assessment or collection of taxes.

The purpose of the Act is to assure that the Government can "assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, 'and to require that the legal right to the disputed sums be determined in a suit for refund.'" *Bob Jones University v. Simon*, 416 U.S. 725, 736, 94 S.Ct. 2038,

2045, 40 L.Ed.2d 496 (1974) (quoting *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962)). "[T]axes are the lifeblood of government." *Bull v. United States*, 295 U.S. 247, 259, 55 S.Ct. 695, 699, 79 L.Ed. 1421 (1935). Our government would be crippled if it was not assured of obtaining the revenue generated through taxation. The Act also was intended to protect the collector from litigation pending a suit for refund. *Id.* at 737, 94 S.Ct. at 2046.

The Court finds that neither the literal meaning of the Anti–Injunction Act or the purposes of the Act are offended by proceeding to the merits on this case. This is not a suit which seeks to restrain the assessment or collection of taxes. Plaintiff does not request that taxes not be assessed against them or any other taxpayer. Nor do Plaintiffs seek to prohibit taxes from being collected against them or any other taxpayer.

Plaintiffs argue that all taxpayers should be taxed according to uniform standards. If Plaintiffs obtain the relief sought, the taxpayers who benefit under the transition rules probably will have to pay additional taxes. This result does not inhibit the Government's ability to obtain needed revenue.

In addition, the thrust of the Anti–Injunction Act is to prevent taxpayers from circumventing administrative and judicial forums provided by Congress. *Graham v. U.S.*, 528 F.Supp. 933 (E.D.Pa.1981). Where there is no alternative forum which Congress has established for Plaintiffs' rights to be adjudicated, the Anti–Injunction Act does not prevent the suit. *South Carolina v. Regan*, 465 U.S. 367, 374, 104 S.Ct. 1107, 1112, 79 L.Ed.2d 372 (1984).

Congress set up a system whereby taxpayers are to pay disputed taxes and then seek to have their claim of improper

169 (1985). Of course, the present case deals with domestic affairs.

**8.** It should also be noted that the federal courts have frequently considered the constitutionality of provisions in prior Tax Acts. *See e.g. Grosso*

*v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); *National Life Ins. v. United States*, 277 U.S. 508, 48 S.Ct. 591, 72 L.Ed. 968 (1928); *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895).

taxation determined in a refund suit. This alternative forum cannot provide the relief which Plaintiffs seek in this case. Plaintiffs are requesting that all taxpayers be treated uniformly, including those who now receive the benefit of the transition rules. Certainly, Plaintiffs could alter the form of relief which they seek and request a rebate, alleging that they should be treated the same as the taxpayers that obtained a transition rule who are similarly situated to the Plaintiffs. However, Plaintiffs are not requesting that they be treated like the select few who received the benefits under the transition rules, and this Court finds that Plaintiffs should not have to frame their relief in such a manner to have their claims adjudicated.[9]

In sum, the Court finds that the Anti–Injunction Act does not bar this suit for two reasons.[10] First, this is not a suit seeking to enjoin the assessment or collection of taxes. Secondly, there is no alternative avenue through which Plaintiffs can adjudicate their claims since the relief they request cannot be obtained in a refund suit.

*South Carolina v. Regan,* 465 U.S. 367, 378, 104 S.Ct. 1107, 1114, 79 L.Ed.2d 372 (1984) (Anti–Injunction Act does not apply when no alternative remedy is available); *Abortion Rights Mobilization, Inc. v. Regan,* 544 F.Supp. 471, 489–90 (S.D.N.Y. 1982).

## IV. The Uniformity Clause

■ The Uniformity Clause provides: "The Congress shall have power to lay and collect Taxes, Duties, Imposts and Excises, ... but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. 1, § 8, cl. 1. Income taxes are classified as duties, imposts and excises or, in other words, indirect taxes, *Brushaber v. Union P.R. Co.,* 240 U.S. 1, 15, 36 S.Ct. 236, 240, 60 L.Ed. 493 (1916), and, therefore must be uniform.

In *Knowlton v. Moore,* 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969 (1900), the United States Supreme Court thoroughly analyzed the Framers' intent when they included this provision in the Constitution. The Su-

---

**9.** The constitutionality of the Anti–Injunction Act could be called into question if courts interpreted it to prohibit suits where there is no adequate alternative remedy in the form of a refund suit. If the Anti–Injunction Act prevented a suit where there was no other adequate forum, such as a refund suit, there would be serious questions as to whether the Act violated the Due Process Clause because it would foreclose one's right to an adjudicative forum. *Schildcrout v. McKeever,* 580 F.2d 994 (9th Cir. 1978). However, by suppressing the literal interpretation of the Act and by considering the purpose for which it was enacted, the courts have found that the Act does not prevent one from seeking an injunction when no alternative procedures for seeking relief are available. *Enochs v. Williams Packing and Navigation Co.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). This interpretation of the Act has prevented it from being declared unconstitutional. *Bob Jones Univ. v. Simon,* 416 U.S. 725, 742, 94 S.Ct. 2038, 2048, 40 L.Ed.2d 496 (1974).

These constitutional problems have also been skirted with the Declaratory Judgment Act. That Act provides in pertinent part,

(a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1954 or a proceeding under section 505 or 1146 of title 11, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal rela-

tions of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201 (1987). A literal interpretation of this Act would indicate that the federal courts could not declare that a federal taxation statute is unconstitutional. This would fly in the face of *Marbury v. Madison,* which states that the federal courts are the ultimate interpreters of the Constitution and that the courts have a duty to consider the constitutionality of congressional enactments which are properly brought before the courts.

Courts have found that the Declaratory Judgment Act and the Anti–Injunction Act are coterminous. *Eastern Kentucky Welfare Rights Org. v. Simon,* 506 F.2d 1278, 1285 (D.C.Cir.1974). Therefore, the Declaratory Judgment Act does not prevent this Court from declaring that the transition rules are unconstitutional.

**10.** "A suit to restrain the allowance of tax benefits falls outside the literal reach of § 7421(a). Moreover, cases of this nature, ultimately raising nonfrivolous constitutional objections to IRS action, are 'few and far between': they do not threaten large interference by 'public interest' litigants with the administrative process of collecting taxes. *See* Bittker & Kaufman, *Taxes and Civil Rights: 'Constitutionalizing' the Internal Revenue Code,* 82 Yale L.J. 51, 55 (1972)." *Wright v. Regan,* 656 F.2d 820, 836 n. 52 (D.C. Cir.1981).

preme Court concluded that this provision only required that Congress impose duties, imposts and excises, or, in other words, indirect taxes which are *geographically* uniform. *See also Brushaber v. Union P. R. Co.*, 240 U.S. 1, 12, 36 S.Ct. 236, 239, 60 L.Ed. 493 (1916). The Framers wanted to be sure that Congress did not impose an indirect tax on the inhabitants of one state which was different than the indirect tax imposed on the inhabitants of another state. Recently, the Supreme Court reaffirmed this view of the Uniformity Clause in *United States v. Ptasynski*, 462 U.S. 74, 103 S.Ct. 2239, 76 L.Ed.2d 427 (1983), wherein the Court stated that an indirect tax could affect citizens of different states differently, so long as the purpose of the indirect tax was not to favor the citizens of one state over the citizens of another state.[11] The Court recognized that Congress could enact a law which favored citizens in one region of the country so long as it was directed at a situation which was unique to that part of the country. Indirect taxes necessarily will effect taxpayers in various states differently since states will have different quantities of the subject being taxed. "An indirect tax on articles or actions so diverse in their existence is valid, so long as in each state where

the subject of the tax is found, the tax is applied, and applied with equal force." *Ptasynski v. United States*, 550 F.Supp. 549, 553 (D.Wy.1982), *rev'd on other grounds*, 462 U.S. 74, 103 S.Ct. 2239, 76 L.Ed.2d 427 (1983).

The Court finds that the transition rules do not violate the Uniformity Clause because there is no evidence that the transition rules benefit or hinder the citizens of any state or region of the country.

V. Equal Protection Doctrine

■ The Equal Protection doctrine under the Fifth Amendment requires similarly situated individuals to be treated similarly. *Johnson v. Robison*, 415 U.S. 361, 374–75, 94 S.Ct. 1160, 1169–70, 39 L.Ed.2d 389 (1974) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). Put another way, all people in a class must be treated equally. In addition, a classification of people must bear a rational relationship to a legitimate governmental purpose. *Wheeler v. United States*, 768 F.2d 1333, 1337 (Fed.Cir.1985). The Supreme Court has simplified the inquiry into two questions. First, does the challenged legislation have a legitimate purpose, *Western &*

---

**11.** This Court recognizes that the Supreme Court, in *Ptasynski,* stated that the Uniformity Clause required geographic uniformity, but that such may not identify the breadth of the uniformity requirement. However, with the Supreme Court's reaffirmance of *Knowlton* in *Ptasynski,* this Court does not see how the Uniformity Clause can require more than geographic uniformity since the Constitution is to be interpreted in light of the Framers' intent.

Plaintiffs direct this Court to the Supreme Court's interpretation of another Uniformity Clause in the Constitution. In *Railway Labor Executives' Ass'n v. Gibbons,* 455 U.S. 457, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982), the Supreme Court considered the breadth of the Bankruptcy Uniformity Clause. Article I, § 8, cl. 4, of the Constitution provides that Congress shall have the power to "establish ... uniform laws on the subject of Bankruptcies throughout the United States." In *Gibbons,* the Court looked to the intent of the Framers when they enacted the clause and found that the clause requires that all similarly situated individuals be treated the same under the bankruptcy laws. *Id.* at 472–73, 102 S.Ct. at 1178–79. Bankruptcy laws cannot favor just one or a few debtors. *Id.*

This Court recognizes that the Supreme Court has defined the scope of the Taxation Uniformity Clause and the Bankruptcy Uniformity Clause differently. The Taxation Uniformity Clause only requires geographic uniformity. The Bankruptcy Uniformity Clause requires that similarly situated individuals be treated the same. The Court also realizes that the two Uniformity Clauses are contained in Article I, section 8 of the Constitution. However, the Supreme Court has relied on the intent of the Framers in making this distinction.

This Court cannot expand the definition of the Taxation Uniformity Clause beyond a requirement of geographic uniformity without ignoring the principle of *starie decisis.* Other Courts have implicitly recognized this limitation on the clause since the Courts have evaluated claims of unequal taxation under the Equal Protection Doctrine embodied in the Fifth Amendment instead of the Taxation Uniformity Clause. *See e.g. Wheeler v. U.S.,* 768 F.2d 1333, 1337 (D.C. Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986).

*Southern Life Ins. Co. v. Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981), or, put another way, are the objectives of the legislation permitted by the Constitution? *Fullilove v. Klutznick,* 448 U.S. 448, 473, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902 (1980). Second, was it reasonable for the Congress to believe that the challenged classification would promote the purpose of the legislation, *Western & Southern Life Ins.,* 451 U.S. at 668, 101 S.Ct. at 2083, or, alternatively, was the criteria used for establishing the classification a constitutionally permissible means for achieving the purpose of the legislation. *Fullilove,* 448 U.S. at 473, 100 S.Ct. at 2772.

First, a court must determine the purpose of the congressional enactment and determine if it is constitutionally permissible. Then the Court must determine the classification created by the statute. Finally, the Court must determine if the classification is rationally related to the governmental interest.

The basis for the classification by the legislature need not be on the face of the legislation or in the legislative history. *Wheeler,* 768 F.2d at 1337. The classification will not be set aside so long as the Court can reasonably conceive of a justification for the classification. *Id.* However, there must be *some* justification.

The legislative history for the 1986 Tax Act states that the purpose of the transition rules was to ease the transition from the old tax law to the new tax law for those taxpayers who relied upon the old tax laws and who would be unduly affected by the change in the laws. 132 Cong.Rec. S13786 (daily ed. Sept. 26, 1986).

The Court finds that making adjustments under a new tax law for those who would be unduly burdened is a "legitimate governmental purpose" and does not violate the Constitution. Such pervasive changes in the tax law have seldom been seen in our country. Numerous taxpayers may have taken actions based upon the old tax law. Some of these taxpayers may be unduly burdened by the new Act. Congress certainly has the right to draft legislation to protect a group of taxpayers who are so affected.

The next question is how to define the classification(s). In this case, the Court finds that there are several classifications. There are one or more taxpayers who are exempted for several provisions in the tax code. Each taxpayer or group of taxpayers who are treated differently from the vast majority of taxpayers compose a classification. For instance, section 701 of the Act increases the alternative minimum tax for all corporations. However, section 703(b) does not increase the alternative minimum tax for one corporation—Control Data. Control Data is in a classification separate from all other corporate taxpayers.

The final question is whether the classification is rationally related to the congressional purpose. "The Legislatures have especially broad latitude in creating classifications and distinctions in the tax statutes." *Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 547, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983).[12] "Since the members of the Legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the *most explicit demonstration* that a classification is a hostile and oppressive discrimination against particular persons and classes." *Id.* (quoting *Madden v. Kentucky,* 309 U.S. 83, 87–88, 60 S.Ct. 406, 407–408, 84 L.Ed. 590 (1940) (footnotes omitted)) (emphasis added).[13] Alternatively, Plaintiff must "negative ever conceivable basis which might support" the legislative enactment. *Madden v. Kentucky,* 309 U.S. at 88, 60 S.Ct. at 408.

---

**12.** The presumption of constitutionality is extremely difficult to overcome. *Wheeler v. United States,* 768 F.2d 1333, 1337 (Fed.Cir.1985).

**13.** Alternatively, a court will not disturb a classification unless (1) it is invidious, meaning that it discriminates unfairly, or (2) it unjustifiably infringes a fundamental right. *Regan,* 461 U.S. at 548, 103 S.Ct. at 2002; *Estate of Cowser v. C.I.R.,* 736 F.2d 1168, 1173 (7th Cir.1984).

Thus, the Supreme Court has presented a difficult task for those challenging tax legislation under the Equal Protection doctrine.[14] Plaintiffs have specifically directed the Court to several transition rules which benefit taxpayers who Plaintiffs contend are similarly situated to themselves (sections 204, 211(e)(4), 251, 252(f)(3), 302(c), 503(c)(2) and 703(b) of the 1986 Tax Reform Act). However, this Court is unable to determine whether there is a rational basis for the classification based upon the evidence presented. The Court directs the parties to present additional evidence to the Court, either in the form of affidavits or live testimony to determine whether these classifications are rationally related to the purpose of protecting taxpayers who would be unduly burdened by the new tax laws.

VI. Conclusion

The Court rejects all arguments presented by Plaintiffs for their position that the 1986 Tax Act is unconstitutional, except for Plaintiffs' equal protection argument. The Court reserves ruling on this issue until further evidence is presented to the Court in accordance with a separate order entered today. Therefore, the Court GRANTS Defendant's motion for Summary Judgment in part and DENIES Plaintiff's motion for summary judgment in part.

---

**14.** The standard established by the Supreme Court is a recognition that "Congress has exercised its considered judgment with respect to an enormously complex problem [and] we are reluctant to disturb its determination." *United States v. Ptasynski,* 462 U.S. 74, 86, 103 S.Ct. 2239, 2246, 76 L.Ed.2d 427 (1983). The standard seems to obviate a consideration of whether similarly situated people are treated the same. The standard directs ones attention away from a consideration of whether the classification is rationally related to the legislative purpose. The courts are not to meaningfully consider whether there is any logical justification for the class in relation to legislative purpose. Only the most egregious classifications can be struck down—those that are "hostile and oppressive" to particular persons and classes. Even if there is evidence that similarly situated people are treated differently, it seems that an Act cannot be struck down unless the classification is "hostile and oppressive" to the similarly situated people.

For instance, in this case, the Legislative History openly acknowledges that there is no way to know how many other taxpayers fulfill the requirements for a transition rule. All we know about the requirements for a transition rule are that Senator Packwood and Representative Rostenkowski had four or five criteria which the transition rules could not violate. The two Congressmen then looked at all of the proposed transition rules presented to them by members of Congress and decided which taxpayers had a transition rule favoring them put into the bill. 132 Cong.Rec. S13786 (daily ed. Sept. 26, 1986). The Legislative History acknowledges that there is no way of knowing how many other taxpayers satisfy the requirements for a transition rule, but did not obtain one. 132 Cong.Rec. S13810 (daily ed. Sept. 26, 1986).

The test established by the Supreme Court effectively negates a consideration of the closeness between the classification and the legislative purpose. The classifications may be significantly under-inclusive, since no one knows how many taxpayers are similarly situated to those who received transition rules. Yet the equal protection principles may not be offended under the Supreme Court test if the classification is not "hostile and oppressive" to particular persons and classes.