United States Court of Appeals,

Fifth Circuit.

No. 91–1083.

APACHE BEND APARTMENTS, LTD., et al. Plaintiffs-Appellants,

v.

UNITED STATES of America, Acting Through the INTERNAL REVENUE
SERVICE Defendant-Appellee.

June 25, 1992.

Appeal from the United States District Court for the Northern
District of Texas.

Before GOLDBERG, JOLLY, and WIENER, Circuit Judges.

GOLDBERG, Circuit Judge:

In an effort to dampen the impact of the radical changes
brought about by the Tax Reform Act of 1986, Congress provided
certain taxpayers exemptions from the new tax laws. In many
instances, Congress designed these exemptions, known as "transition
rules," to favor only one or a very few taxpayers. The method by
which Congress selected those taxpayers that would enjoy the
benefit of the transition rules is the subject of this lawsuit.

Plaintiffs are taxpayers that were not granted any relief
under the transition rules. Claiming that they are similarly
situated to those taxpayers to whom the transition rules do apply,
they brought this lawsuit to challenge the constitutionality of the
transition rules under the Uniformity Clause and equal protection
component of the Due Process Clause of the United States
Constitution. They argued that Congress exhibited favoritism to
those taxpayers with strong congressional lobbies, and thus

discriminated against those taxpayers, like plaintiffs, that "were not fortunate to have an ear in Congress." 132 Cong.Rec. H 8,389-90 (daily ed. Sept. 25, 1986) (statement of Rep. Kolbe). Plaintiffs sought declaratory and injunctive relief, requesting that the court enjoin the enforcement of the transition rules so that no taxpayer could benefit from them.

In a published opinion, the district court articulated the relevant facts, parsed the legislative history of the Tax Reform Act, studied the precedents germane to the issues raised, and detailed the legal basis for its decision. 702 F.Supp. 1285 (N.D.Tex.1988). In the end, it concluded that although these plaintiffs had standing to raise their claims, and although the court otherwise had jurisdiction to award the requested relief, the transition rules of the Tax Reform Act of 1986 were not constitutionally infirm.[1]

Our task on appeal is simplified by the exemplary efforts of the district court.[2] We need not retrace all of its steps to

---

[1]The court initially reserved ruling on the equal protection claim in order to allow the parties to submit evidence on whether there was a rational basis for the classification. 702 F.Supp. at 1298. In an unpublished order, the court granted summary judgment in favor of the government, finding nothing in the evidence tendered to the court undermining the rationality of the classification.

[2]We are also assisted by the scholarly work of Professor Lawrence Zelenak, whose law review article on the subject case has facilitated our research and contributed to our analysis of the issues. *See* Lawrence Zelenak, *Are Rifle Shot Transition Rules and Other Ad Hoc Legislation Constitutional?,* 44 Tax L.Rev. 563 (1989).

affirm its judgment. Rather, we limit our discussion to two issues: first, whether these plaintiffs have standing to enjoin the application of the transition rules, and second, whether the transition rules violate the equal protection component of the Due Process Clause. In all other respects, we agree with the district court's reasoning.[3]

## I. STANDING

The district court concluded that plaintiffs have standing to challenge the constitutionality of the transition rules. Under what the district court described as general standing principles, the court reasoned that plaintiffs suffered an injury, traceable to the Tax Reform Act, which the court could redress by prohibiting the enforcement of the transition rules. 702 F.Supp. at 1291.

---

[3]We agree with the analysis of the district court, 702 F.Supp. at 1294-95, rejecting the government's contention that this suit is barred by the Anti-Injunction Act and the Declaratory Judgment Act insofar as plaintiffs seek to have the court nullify the transition rules. *See* Zelenak, *supra* note 2, 44 Tax L.Rev. at 614-15 & n. 251. We do entertain serious doubts as to whether the court would have jurisdiction to enjoin the enforcement of the Tax Reform Act of 1986 as a whole, as plaintiffs requested in their complaint. *See id.* at 615 n. 252. Our concern need not detain us, however, because having determined that the court has jurisdiction to enjoin the enforcement of the transition rules, we must address their constitutionality in any event. *Cf. City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (question whether a court has jurisdiction to award one form of relief is to be determined independently of whether the court has jurisdiction to award some other form of relief); *Society of Separationists v. Herman,* 959 F.2d 1283 (5th Cir.1992) (en banc) (same).

We also concur in the district court's rejection of plaintiffs' constitutional challenge to the transition rules under the Uniformity Clause of the Constitution, Art. I, § 8, clause 1. 702 F.Supp. at 1295-96 & n. 11.

The standing question is complicated in this case by the nature of the relief sought by plaintiffs. They do not ask for the benefit of the transition rules that favor only the select taxpayers. Rather, they seek equality in treatment through the nullification of the transition rules. That is, they merely wish to have the court enjoin the government from providing the tax breaks presently accorded the select taxpayers through the transition rules so that all taxpayers will be treated alike. Thus, plaintiffs do not expect to obtain any tangible benefit or economic relief from their lawsuit, only the elimination of what they perceive to be discriminatory treatment.

The requested relief raises concerns about redressibility. It is well settled that a plaintiff has standing to bring a claim in federal court only if he can show an actual or threatened injury, attributable to the defendant, which the court can redress. *Heckler v. Mathews,* 465 U.S. 728, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984). If we view the injury suffered by plaintiffs in this case as the increased tax liability attendant to the new tax laws, then one might argue convincingly that nullifying the transition rules will in no way redress plaintiffs' injury, for they will continue to bear the increased tax liability even in the absence of the transition rules. Indeed, the only impact of nullification would be to impose that same tax liability upon those taxpayers enjoying favorable treatment under the transition rules. Viewed in that light, it would appear that plaintiffs have no standing because the relief sought would not redress the economic injury

suffered. In essence, they would be litigating the tax liability of third parties—the taxpayers favored by the transition rules.

But in fact, the injury alleged by plaintiffs is not exclusively an economic one. Rather, plaintiffs contend that the disparity in treatment is itself a judicially cognizable injury, attributable to the government by virtue of its enforcement of the transition rules, which the federal court can redress. The court can redress this injury, in plaintiffs' view, *either* by making the transition rules applicable to plaintiffs (insofar as they are similarly situated), *or* by eliminating the transition rules altogether so that no one gets a tax break. In their complaint, as we have indicated, plaintiffs have pursued the latter course. They seek the satisfaction of knowing that the Tax Reform Act treats no one any better than them: If plaintiffs are not going to get the tax break, then no other similarly situated taxpayer should receive one, either.

We believe that the nullification of the transition rules so as to abrogate the tax breaks accorded to the select few under the transition rules would provide appropriate redress for the injuries alleged by plaintiffs. With respect to plaintiffs' equal protection claim, *Heckler v. Mathews*, 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984), is right on point. In that case, the Supreme Court held that nondependent male retirees had standing to bring an equal protection challenge to a law favoring nondependent female retirees, even though the only redress available to him

would be the abrogation of benefits to the nondependent female retirees: A severability clause in the statute provided that if the statute were declared unconstitutional, the favorable treatment accorded to female retirees would be eliminated. Thus, the male plaintiff had no chance of obtaining the benefits afforded to female retirees under the statute; the most he could hope for was equality in treatment through the discontinuation of benefits to females. Reasoning that the injury in an equal protection case is not the denial of benefits alone but the denial of equal treatment as well, the Court concluded that "the appropriate remedy is a *mandate* of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Mathews,* 104 S.Ct. at 1395 (emphasis in original) (citing *Iowa–Des Moines Nat'l Bank v. Bennett,* 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265 (1931)). The Court explained:

> [W]e have never suggested that the injuries caused by a constitutionally underinclusive scheme can be remedied only by extending the program's benefits to the excluded class. To the contrary, we have noted that a court sustaining such a claim faces "two remedial alternatives: it may either declare the statute a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion."

*Id.* 104 S.Ct. at 1394–95 (quoting *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 1807, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring in result)).

The equal protection challenge levied by plaintiffs in this

case is, for standing purposes, identical to the equal protection claim made in *Mathews.* Plaintiffs contest the classification as "constitutionally underinclusive," attributable to plaintiffs' political impotence, an inability to garner political favoritism from members of Congress. Like *Mathews,* they ask the court to strike down the scheme even though such a remedy would only strip benefits from the favored class; it would not directly enlarge their own pocketbooks.[4] Of course, such a remedy would work to eliminate the disparity in treatment and thus restore equality to the statutory scheme. And

> because [the taxpayer plaintiffs] personally [have] been denied benefits that similarly situated [favored taxpayers] receive, [theirs] is not a generalized claim of the right possessed by every citizen, to require that the Government be administered according to law.

*Mathews,* 104 S.Ct. at 1396 n. 9 (quotations and citations omitted).

Some might suggest that the rule of *Mathews*—conferring standing in equal protection cases in which the only remedy available to the disfavored class is the elimination of benefits to the favored class—should be reserved for those cases involving

---

[4]Even though eliminating the transition rules would not affect plaintiffs' pocketbooks directly, it would do so indirectly. The tax collector would garner more contributions for the public purse from the entities exempted by the transition rules. In theory, the additional tax revenue collected from those taxpayers exempted from taxation by the transition rules make it more likely that the budgetary requirements would be met with lower taxation for every taxpayer. In other words, eliminating preferences for the few would mean lower taxes for the many. As the government concedes in this court: "In the instant case, a very few taxpayers have received an extra benefit, while the vast majority could be said to be extra burdened. The burden is thus spread among the many." (R.163)

stigmatic injury of the "archaic" variety: discrimination based on a characteristic of the person disfavored, such as race, alienage, national origin, gender, residence, age, or legitimacy.[5] We do not share that view. As we explain in Part II.A. of this opinion, a classification scheme violates equal protection even if the classifications are not drawn along suspect or quasi-suspect lines; classifications of any sort that are not rationally related to a legitimate governmental interest are unconstitutional. Equal protection is not concerned exclusively with archaic stigmas.[6] When a plaintiff alleges that he has been "*personally* denied equal treatment," *Mathews,* 104 S.Ct. at 1395 (emphasis added)—that he has been denied a particular benefit accorded to others who are similarly situated—he has alleged an equal protection injury, regardless of the nature of the stigma that attaches to the disfavored class. *See Allegheny Pittsburgh Coal Co. v. County*

[5]Professor Zelenak observes that "[t]here is language in the *Mathews* opinion suggesting that the "serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group,' are essentially the injuries of being stereotyped or stigmatized." Zelenak, *supra* note 2, 44 Tax L.Rev. at 619 (1989). He posits that the Court could confine the reach of *Mathews* by limiting equal protection standing to plaintiffs who have been stigmatized or stereotyped by the classification, and that, unlike classifications based on race or gender, the classification in this case carries no stigma or stereotype. In the end, however, Professor Zelenak concludes that the Court would not give such a cramped reading to the *Mathews* opinion and would find standing in this case. *Id.*

[6]Interestingly, *Mathews* involved a challenge to a statutory scheme favoring nondependent female retirees. The lawsuit was brought by nondependent male retirees, hardly a class suffering from the archaic stigma that would make them feel that they were "less worthy participants in the political community." *See also Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 1111–1114, 59 L.Ed.2d 306 (1979) (striking down state statute that authorized the imposition of alimony obligations on husbands, but not wives).

*Comm'n,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) (holding that formula used for property valuation was unconstitutional because it valued comparable properties differently); *see also City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (entertaining but rejecting equal protection challenge to city ordinance which contained a "grandfather clause"); *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (entertaining but rejecting equal protection challenge to statutory scheme which provided select employees with windfall benefits).

Here, plaintiffs *allege* that they have been denied tax breaks afforded to other similarly situated taxpayers by the transition rules. *Contrast Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3326–27, 82 L.Ed.2d 556 (1984) (no standing because plaintiffs themselves had not been denied equal treatment). They say that there is no rational basis for denying them the tax breaks. Were we to agree with plaintiffs on the merits, we could redress that injury either by extending to them the transitional relief accorded to the select taxpayers or by nullifying the transition rules altogether. Under either course, we could achieve the "*mandate* of equal treatment." *Mathews,* 104 S.Ct. at 1395 (emphasis in original).

We are also persuaded, for similar reasons, that these plaintiffs have standing to bring a challenge to the classification under the Uniformity Clause of the Constitution: "If being treated

unequally is itself sufficient injury to establish equal protection standing, then being taxed nonuniformly should be itself sufficient injury to establish uniformity clause standing."  Zelenak, *supra* note 2, 44 Tax L.Rev. at 620 (1989).[7]

In all, we conclude that plaintiffs have standing to press their constitutional claims under the equal protection component of the Due Process Clause and under the Uniformity Clause of the Constitution.[8]  But for the reasons expressed by the district

_____

[7]Professor Zelenak notes that there is an argument against extending the rationale of *Mathews* to the Uniformity Clause context.  He observes that the Uniformity Clause makes no references to the rights of individuals but focuses instead on the rights of states. *See United States v. Ptasynski,* 462 U.S. 74, 103 S.Ct. 2239, 76 L.Ed.2d 427 (1983);  *Knowlton v. Moore,* 178 U.S. 41, 89, 20 S.Ct. 747, 766, 44 L.Ed. 969 (1900). Arguably, therefore, individuals have no standing to raise a challenge under the Uniformity Clause.  Professor Zelenak rejects that argument because "[r]ights of States are, in the final analysis, meaningful only inasmuch as they create rights in persons within those States.  The tax uniformity clause has meaning only as a guarantee that *persons* will not be discriminated against in taxation because of where they happen to be located."  Zelenak, *supra* note 2, 44 Tax L.Rev. at 621.

[8]The district court held that plaintiffs had "taxpayer standing" to bring their uniformity clause challenge.  702 F.Supp. at 1292 (applying the two-prong test of *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (taxpayer standing to bring establishment clause challenge to federal spending on parochial schools)).

It appears that these plaintiffs fit neatly within the two-prong test for taxpayer standing set forth in *Flast* insofar as their uniformity clause challenge is concerned: They challenge the exercise "of congressional power under the *taxing* and spending clause of Art. I, § 8, of the Constitution," *Valley Forge College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 478, 102 S.Ct. 752, 761, 70 L.Ed.2d 700 (1982) (emphasis added), and allege that the "challenged enactment exceeds specific constitutional limitations upon the exercise of the *taxing* and spending power" (that the tax is prohibited by the Uniformity Clause of the Constitution, a limitation on

court, and as we shall elaborate with respect to the equal protection claim, we do not find the classification scheme constitutionally infirm.

## II. EQUAL PROTECTION

As Congress debated the passage of the Tax Reform Act of 1986, it became quite clear that the package of legislation would necessarily include transition rules: exemptions from the new tax laws designed to assist those taxpayers that had relied on the previous tax laws in making significant investment decisions. For the most part, these *ad hoc* tax provisions were not available to all taxpayers, but only to those on behalf of whom particular members of Congress had requested the exemptions. Members of Congress appeased their requesting constituents by according them transitional relief, yet avoided threatening the viability of the tax package by evading the extension of transitional relief across the board. A transition rule of general application, as opposed to these "rifle shot" transition rules, would have been far more

Congress' taxing power). *Id.* at 479, 102 S.Ct. at 762 (emphasis added). *Contra* Zelenak, *supra* note 2, 44 Tax L.Rev. at 623 & n. 278 ("The difficulty, in a case like *Apache Bend,* is in identifying the *spending* necessary to support taxpayer standing."). We note that the Supreme Court has not yet identified a provision in the Constitution, other than the Establishment Clause, which operates as a limitation on the taxing and spending power so as to vest plaintiffs with taxpayer standing. Zelenak, *supra* note 2, 44 Tax L.Rev. at 624 ("It is unlikely that the Supreme Court will ever recognize taxpayer standing in suits based on any part of the Constitution other than the Establishment Clause."). Because we conclude that these plaintiffs have standing under traditional standing principles, we need not decide, and express no opinion on, whether these plaintiffs would otherwise have taxpayer standing under *Flast.*

costly in terms of tax revenue, albeit eminently fairer.

This method of doling out tax breaks raised more than a few eyebrows in Congress. Several members of Congress expressed concern that similarly situated taxpayers were not being treated equally. 702 F.Supp. at 1287-89 (quoting 132 Cong.Rec. S 8,128 (daily ed. June 23, 1986) (statement of Sen. Levin); *id.* at S 13,810 (daily ed. Sept. 26, 1986); 132 Cong.Rec. H 8,389-90 (daily ed. Sept. 25, 1986) (statement of Rep. Kolbe); 132 Cong.Rec. S 7,654 (daily ed. June 17, 1986) (statement of Sen. Metzenbaum)). Others conceded their use of raw political power to obtain transition rules for favored constituents. *Id.* Even in this court, the government acknowledges that "political considerations definitely played a significant role in the selection process ... [and] the focus of the debate was on subjective factors [as opposed to objective factors]." (R.135)

Plaintiffs contend that no rational basis exists for Congress' classification as between those taxpayers afforded relief under the transition rules and those who were not. They maintain that but for the fact that they did not have "the right people speaking for [them]" in Congress, 132 Cong.Rec. S 13,874 (daily ed. Sept. 26, 1986) (statement of Sen. Metzenbaum), they are similarly situated to those taxpayers who presently enjoy tax breaks accorded by the transition rules. In plaintiffs' view, this classification—providing benefits only to those taxpayers with connections in Congress and the political savvy to exploit those

relationships—amounts to a violation of equal protection.

                                    A.

In order to properly adjudge plaintiffs' claim, we first establish the relevant legal framework.  When a fundamental right is at stake, or the classification at issue is inherently suspect—classification based on race, national origin, and alienage—the courts evaluate the legislation under the most exacting standard:  strict scrutiny.  *Town of Ball v. Rapides Parish Police Jury,* 746 F.2d 1049, 1059 (5th Cir.1984).  Such a classification "will almost never be based on legitimate governmental reasons," and to survive judicial review, "must further a compelling governmental interest which cannot be served by alternative means less burdensome to the suspect class or fundamental right or interest."  *Id.* (footnotes omitted).  Thus, under strict scrutiny, legislative classifications must serve a compelling governmental interest and be narrowly tailored to the achievement of that interest.

The courts examine legislative classifications not involving "suspect" classes but involving other classifications "giv[ing] rise to recurring constitutional difficulties"—gender and illegitimacy—under an "intermediate" or "heightened" scrutiny.  *Id.* at 1059-60.  Although not as exacting as strict scrutiny, this intermediate scrutiny nevertheless demands that the "quasi-suspect" classification serve important governmental interests and be substantially related to the achievement of those interests.  *Id.;*

*City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985).

The classifications at issue in this case are neither "suspect" nor "quasi-suspect." This is an equal protection challenge to tax legislation, a form of economic regulation. The Supreme Court has exhibited special deference to legislative bodies in this arena. Indeed, tax legislation carries with it a "presumption of constitutionality," *Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 547, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983) (quoting *Madden v. Kentucky,* 309 U.S. 83, 87–88, 60 S.Ct. 406, 407–08, 84 L.Ed. 590 (1940), and "[l]egislatures have especially broad latitude in creating classifications and distinctions in the tax statutes." *Id.* Contrary to plaintiffs' argument, taxation does not implicate a fundamental right and, thus, classifications in tax schemes are not subject to strict scrutiny.[9] Rather, the Court "presumes the challenged statutory distinctions are constitutional and requires only that they be rationally related to a legitimate [governmental] interest." *Town of Ball,* 746 F.2d at 1058. To be sure, the Supreme Court recently applied the rational relation test in a case, like this one, involving an equal protection challenge to a tax scheme. *See Allegheny Pittsburgh Coal Co. v. County Comm'n,*

---

[9]Plaintiffs' reliance on *Corfield v. Coryell,* 6 F.Cas. 546 (No. 3,230) (CCED Pa.1825) is unavailing, for that case delineated the scope of rights under the Privileges and Immunities Clause of Article 4, § 2, Clause 1 of the Constitution, not the equal protection component of the Due Process Clause.

488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). The Court reiterated the principle that so long as "the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of equal protection of the law." *Id.* 109 S.Ct. at 638 (quoting *Brown-Forman Co. v. Kentucky,* 217 U.S. 563, 573, 30 S.Ct. 578, 580, 54 L.Ed. 883 (1910)).

That the Supreme Court has only in rare instances struck down economic regulations is hardly surprising, for the rational basis test is not nearly as rigorous as the strict or intermediate scrutiny tests. Though not a tax case, the Court's decision in *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), provides an illustrative example of the Court's application of the rational basis test. In *Dukes* the Court upheld a "grandfather clause" that exempted two pushcart food vendors from a law prohibiting the sale of food from pushcarts in the historic French Quarter, the "Vieux Carre," of New Orleans. The government asserted an interest in preserving "the appearance and custom valued by the Quarter's residents" and maintaining the charm and character that attracted tourists. *Id.* 96 S.Ct. at 2515. The City's ban of pushcart food vendors from the French Quarter applied to all vendors except for those who had "continuously operated the same business within the Vieux Carre ... for eight or more years." Only two vendors qualified for the exception. A panel of this court found a "pivotal defect" in the City of New Orleans' classification scheme. We found no foundation in the hypothesis

that the "favored class" was any more likely "to operate in a manner more consistent with the traditions of the Quarter than would any other operator" and "no reason to believe that length of operation "instills in the [favored] licensed vendors (or their likely transient operators) the kind of appreciation for the conservation of the Quarter's tradition' that would cause their operations to become or remain consistent with that tradition." *Id.* (quoting 501 F.2d 706, 711–12 (5th Cir.1974)). We thus concluded that the classification violated equal protection because it did not bear a rational relation to the asserted government interest.

The Supreme Court did not agree. It explained that

> [l]egislatures may implement their program step by step in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations ... [R]ather than proceeding by the immediate and absolute abolition of all pushcart food vendors, the city could rationally choose initially to eliminate vendors of more recent vintage. This gradual approach to the problem is not constitutionally impermissible.

*Id.* 96 S.Ct. at 2517. Like the classification scheme at issue in the instant case, "[t]he grandfather clause in *Dukes* was legitimated by the purpose of protecting "substantial reliance interests' " in the favored class. *See* Zelenak, *supra* note 2, 44 Tax L.Rev. at 582. The Supreme Court elucidated:

> The city could reasonably decide that newer businesses were less likely to have built up substantial reliance interests in continued operation in Vieux Carre and that the two vendors who qualified under the "grandfather clause"—both of whom had operated in the area for over twenty years rather than

> eight—had themselves become part of the distinctive character
> and charm that distinguishes the Vieux Carre.  We cannot say
> that these judgments so lack rationality that they constitute
> a constitutionally impermissible denial of equal protection.

*Dukes,* 96 S.Ct. at 2518.


Significantly, the *Dukes* Court overruled *Morey v. Doud,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), "the only case in the last half century to invalidate wholly economic regulation solely on equal protection grounds."  96 S.Ct. at 2518.  *Morey* involved a state statute regulating the issuance of money orders, but exempting the American Express Company by name from all of the statutory provisions.  The government asserted an interest in protecting consumers when transacting in money orders.  The state posited that because American Express was of "unquestionable solvency and high financial standing," it was reasonable for the state to exempt it from the regulations.  The Supreme Court in *Morey* did not buy the argument.  *Morey,* 354 U.S. at 469, 77 S.Ct. at 1352.  It found that the classification bore only a "remote relationship" to the asserted government interest of protecting the public.  The Court bluntly disapproved of "the creation of a closed class by the singling out of ... a named company."  *Id.*


By explicitly overruling *Morey* in *Dukes,* the Supreme Court has opened the door to legislative classifications that single out individuals for preferential treatment, so long as the grounds for doing so have some conceivable foundation in reason.  The implication of *Dukes* to the case at bar is evident;  as Professor Zelenak explains:

> The problem presented to a challenger of an ad hoc tax revision by the overruling of *Morey* is apparent. In *Morey,* the Court adopted the suggested attitude of suspicion to laws which single out one person for special treatment. The overruling thus would seem to indicate that the Court now rejects the notion that such laws should be viewed with any particular suspicion.

Zelenak, *supra* note 2, 44 Tax L.Rev. at 582. Under *Dukes,* legislative classifications which amount to "the creation of a closed class by the singling out of ... a named company," *Morey,* 354 U.S. at 469, 77 S.Ct. at 1352, can withstand scrutiny under the rational basis test.

Another case that reaffirms the judicial deference accorded economic regulation under the rational basis test and illustrates the challenges faced by plaintiffs in this case is the Supreme Court's decision in *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). *Fritz* involved classifications and transitional measures in the Railroad Retirement Act of 1974. The Act, designed to restructure the railroad retirement system, generally eliminated a windfall benefit that inured to employees who had worked for both railroad and nonrailroad employers: those employees qualified for both railroad retirement and social security benefits. The Act eliminated those dual benefits for all but a limited class of employees. One class consisted of those employees who were unretired, had ten years of railroad employment and sufficient nonrailroad employment to qualify for social security benefits, and performed some railroad service in the calendar year 1974 or had a current connection with the railroad as of December 31, 1974. 449 U.S. at 172, 101 S.Ct.

at 458.

Employees who did not qualify for this exemption because they were not employed by a railroad in 1974 and had no "current connection" with it at the end of 1974 brought a class action suit challenging the classification under the equal protection component of the Due Process Clause. *Id.* at 173, 101 S.Ct. at 458. They claimed to be similarly situated to those employees who continued to receive the windfall of dual benefits. The district court agreed and held that a legislative differentiation based solely on whether an employee was active in the railroad business in 1974 was not "rationally related to the congressional purposes of insuring the solvency of the railroad retirement system and protecting vested benefits." *Id.* at 174, 101 S.Ct. at 459.

The Supreme Court reversed, finding the classification scheme constitutionally acceptable. It explained that "Congress could properly conclude that persons who had actually acquired statutory entitlement to windfall benefits while still employed in the railroad industry had a greater equitable claim to those benefits than the members of [plaintiff's] class who were no longer in railroad employment when they became eligible for dual benefits." *Id.* at 178, 101 S.Ct. at 461. Citing *Dukes,* the Court reasoned that "[b]ecause Congress could have eliminated windfall benefits for all classes of employees, it is not constitutionally impermissible for Congress to have drawn lines between groups of employees for the purpose of phasing out those benefits." *Id.* at

177, 101 S.Ct. at 460 (citing *Dukes,* 96 S.Ct. at 2517).  "The "task of classifying persons for ... benefits ... inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line,' and the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration."  *Id.* at 179, 101 S.Ct. at 461 (quoting *Mathews v. Diaz,* 426 U.S. 67, 83-84, 96 S.Ct. 1883, 1893, 48 L.Ed.2d 478 (1976)).

B.

The Supreme Court's decision in *Dukes* (overruling *Morey* ) and *Fritz* "suggest that the mode of analysis employed by the Court ... virtually immunizes social and economic legislative classifications from judicial review."  *Fritz,* 449 U.S. at 183, 101 S.Ct. at 464 (Brennan, J., dissenting).  Nevertheless, not all economic regulations pass the rational relation test;  some regulations fail even this lenient examination.  The Court has invalidated tax classifications on equal protection grounds when it has found absolutely no reasonable basis for the classifications. *See, e.g., Allegheny Pittsburgh Coal Co. v. County Comm'n,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) (formula for property valuation based on most recent sale resulting in relative overvaluation, and thus higher tax assessment, for comparable properties);  *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 2472, 86 L.Ed.2d 11 (1985) (higher tax on purchase of out-of-state automobiles based on out-of-state residency);  *Metropolitan Life Ins. v. Ward,* 470 U.S.

869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (lower gross premiums tax rate on domestic insurance companies); *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (zoning ordinance which excluded group homes for the mentally retarded); *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (state dividend distribution plan favoring established residents over new residents); *United States Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (denial of food stamps to households containing a non-relative).

Plaintiffs contend that *Williams* and *Ward, supra,* lend support for striking down the transition rules. In *Williams,* the Court struck down a state law that exempted the payment of state sales taxes by state residents who bought cars out-of-state, but imposed the tax on those moving into the state who had bought cars out-of-state. The Court reasoned:

> residence at the time of purchase is a wholly arbitrary basis on which to distinguish among present Vermont registrants.... The purposes of the statute would be identically served, and with an identical burden, by taxing each. The distinction between them bears no relation to the statutory purpose.

105 S.Ct. at 2472.

Because *Williams* and *Ward,* another case striking down tax classifications, involved discrimination based on residency, they provide limited precedential value with respect to other classifications. The Court's inclination to invalidate the

classifications in *Williams* and *Ward* is perhaps best explained by the Court's distaste for "parochial discrimination." *Ward,* 105 S.Ct. at 1681. As the Court wrote in *Ward:*

> The Equal Protection Clause forbids a State to discriminate in favor of its own residents solely by burdening "the residents of other state members of our federation." ... The validity of the view that a State may not constitutionally favor its own residents by taxing foreign corporations at a higher rate solely because of their residence is confirmed by a long line of this Court's cases so holding.

*Id.* at 1682 (quoting *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959)). In *Williams,* the Court wrote:

> "[E]qual treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out of state." A State may not treat those within its borders unequally solely on the basis of their different residences or States of incorporation.

105 S.Ct. at 2471–72 (quoting *Halliburton Oil Well Co. v. Reily,* 373 U.S. 64, 70, 83 S.Ct. 1201, 1204, 10 L.Ed.2d 202 (1963)). *See also Zobel,* 102 S.Ct. at 2314–15 (duration of residency not rationally related to state's interest).

*Allegheny* is the most apposite, and most recent, case wherein the Court invalidated a tax classification scheme. The Court held that assessments on real property based on most recent acquisition price violated equal protection. The court reasoned that acquisition price did not necessarily correlate with the market value: recently sold property would be valued much higher than identical property that had not been sold for a long time. The

Court concluded that the distinction was truly arbitrary and capricious:

> the fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings. The relative undervaluation of comparable property in Webster County over time therefore denies petitioner the equal protection of the law.

109 S.Ct. at 639. The Court emphasized that "[t]he Equal Protection Clause "applies only to taxation which in fact bears unequally on persons or property of the same class.' " *Id.* at 637 (quoting *Charleston Fed. Sav. & Loan Ass'n v. Alderson,* 324 U.S. 182, 190, 65 S.Ct. 624, 629, 89 L.Ed. 857 (1945) (collecting cases)). But even *Allegheny* is of limited assistance to us because it did not involve classifications which were a product of legislative "line-drawing." *Compare Fritz,* 449 U.S. at 179, 101 S.Ct. at 461. Rather, it involved a formula for valuation found fundamentally flawed insofar as the formula produced "a disparity in assessed values of similar property." 109 S.Ct. at 639.

## C.

We now apply these legal principles to the constitutional challenge levied in this case to determine whether the transition rules can withstand plaintiffs' attack. Under the rational basis test, we must first consider whether the challenged legislation has a legitimate government purpose. If so, we consider whether the challenged classification promotes that legislative purpose. *Town of Ball,* 746 F.2d at 1058–59 n. 36 (quoting *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct.

2070, 2083, 68 L.Ed.2d 514 (1981)).

The district court concluded that Congress had a legitimate governmental purpose in creating the transitional rules:

> The Court finds that making adjustments under a new tax law for those who would be unduly burdened is "a legitimate governmental purpose' and does not violate the Constitution. Such pervasive changes in the tax law have seldom been seen in our country. Numerous taxpayers may have taken actions based upon the old tax law. Some of these taxpayers may be unduly burdened by the new Act. Congress certainly has the right to draft legislation to protect a group of taxpayers who are so affected.

702 F.Supp. at 1297. We agree that the legislature has a legitimate governmental purpose in making exceptions from the general application of the Tax Reform Act to protect "substantial reliance interests." *Dukes,* 96 S.Ct. at 2518. We find nothing inherently invidious in Congress wanting to "soften the blow of the new law on businesses that undertook projects under the [old] tax law, only to be told the rules would be changed in the middle of the game." 132 Cong.Rec. S8,128 (daily ed. June 23, 1986) (statement of Sen. Levin).

But that does not end our inquiry, for we must evaluate not only the purpose of the legislation, but the purpose and legitimacy of the classifications as well. To do that, we must first identify the classification. Plaintiffs take the position that:

> [w]hile assisting all taxpayers with general transition relief would be a valid and appropriate governmental purpose, the objective of providing selective exemptions to only a few, based upon their access to politicians, is an illegitimate and

> prohibited objective ... There can never be a legitimate public purpose served by the arbitrary selection of a favored few from the general applicability of a taxing statute.

Plaintiffs would have us define the "favored" class as those taxpayers with "access to influential members of Congress."

Their argument is not without some foundation.  The district court catalogued the many references in the legislative history to political favoritism exhibited by members of Congress.  *See* 702 F.Supp. at 1287–89.   For example, the Chairman of the Senate Finance Committee confessed that

> [i]t would be foolish of me to say that, on occasion, politics did not enter those judgments.  If the Speaker of the House requested the chairman of the Ways and Means Committee a transition rule, my hunch is that [he] would give it reasonably high priority in his thinking.
>
> If Senator Dole requested one of me, I would give it reasonably high priority in my thinking.

132 Cong.Rec. S13,786 (daily ed. Sept. 26, 1986) (statement of Sen. Packwood).  Another Senator "admitted using his position on the committee to obtain special treatment for his constituents."  702 F.Supp. at 1288.

> I do not mind saying to my colleagues that I have used my position on the Finance Committee to the advantage of the people of Minnesota....  I have used my position to get special rules for my people....

132 Cong.Rec. S8,221 (daily ed. June 24, 1986) (statement of Sen. Durenberger).

Moreover, it is quite plain that absent "access to the

conference committee which enabled them to obtain a so-called transition rule so their activity could continue to be taxed under the old law," 132 Cong.Rec. S13,810 (daily ed. Sept. 26, 1986) (statement of Sen. Levin), there was little, if any, chance that a taxpayer would receive transitional relief.  As one Senator asked: "[W]hat about those who could not come to Washington and make their case?  What about those who could not hire the lobbyists to present their appeal?  Where is the fairness to them?"  *Id.*

While we recognize that politics played a part in determining to whom the transition rules would apply, we nevertheless believe that, in view of the great deference accorded by the Supreme Court to tax legislation, the classifications contain no constitutional malady.  Congress sought to give transitional relief to those taxpayers who petitioned for relief and demonstrated, most convincingly, that they relied substantially on the old tax laws in making major investment decisions.  Not every application for transitional relief was granted, however, political clout notwithstanding.  Congressional staff members examined more than one thousand requests for rifle shot transition relief before recommending the inclusion of several hundred.  As the Senate Finance Committee Chairman explained:

> I did not sit down and go through all 1,000-plus requests one by one, nor did I try to hold the public hearing on all 1,000 of them.  Even if I could give the witnesses 10 minutes each, there would be 10,000 witnesses, and 100,000 minutes.
>
> So what we did is to say to the staff, "Here are the rules by which transitions are to be selected.  Try to avoid violating those rules."  By and large they were successful.

We asked them to try to pass upon the merits of the rest. 132 Cong.Rec. S13,904 (daily ed. Sept. 27, 1986) (statement of Sen. Packwood); *see also id.* 132 Cong.Rec. S13,786 (daily ed. Sept. 26, 1986) ("[A]s honestly as we could, we tried to be fair in the transitions and we tried to make sure that they did not violate the basic tenets of the bill."). Congress could not grant every request for transitional relief, for that would have threatened the success of the Act, which, by design of the President and Congress, was to be revenue neutral, neither raising nor lowering the aggregate level of federal revenue collections.

Of course, "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources." *Plyler v. Doe,* 457 U.S. 202, 227, 102 S.Ct. 2382, 2400, 72 L.Ed.2d 786 (1982). But choices had to be made: tough choices. And as far as we can tell from the legislative history, Congress made their decisions based on the merits of the applications for transitional relief made to the Finance Committee. We realize that those taxpayers with political connections had better access to the Committee than others. Nevertheless, nothing suggests that Congress aimed to exclude others or that Congress designed the classifications with such a purpose in mind:

> If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect. If, however, the adverse impact may reasonably be viewed as an acceptable cost of achieving a larger goal, an impartial lawmaker could rationally decide that that cost should be incurred.

*Fritz,* 449 U.S. at 181, 101 S.Ct. at 462 (Stevens, J. concurring).

Moreover, it appears that Plaintiffs never sought transitional relief from the Tax Reform Act. That places them in an especially difficult position to challenge the rifle shot rules. They did not ask for, and therefore did not receive, the congressional manna:

> Congress cannot be expected to search out on its own those taxpayers whose peculiar circumstances give them strong equitable arguments for special relief from general tax provisions; rather, such taxpayers must come to Congress. Thus providing a special rule for one taxpayer, but not for the other, is rationally related to the legitimate purpose of providing relief for deserving taxpayers, to the extent that can be done without the need for Congress to initiate a hunt for those taxpayers.... [A] legislature should be able to provide special relief for those deserving taxpayers it has found, without providing relief for others it has not found.

Zelenak, *supra* note 2, 44 Tax L.Rev. at 575–76.

We hold that the classifications made by Congress were not arbitrary. It accorded transitional relief to those deserving taxpayers who applied for such relief and established most convincingly that they relied substantially on the old tax laws in making major investment decisions.

### III. CONCLUSION

Even in a democratic government, preferences and inequalities are inevitable. In the legislative arena, as demonstrated in this case, lines must be drawn, and those lines often appear arbitrary. That may mean that in some instances, two seemingly identical persons will receive seemingly unequal treatment. Pure equity is

sometimes eschewed for the ultimate goal of adopting legislation.

Preferences also permeate the other two branches of government, especially when discretion plays a role. The judicial branch engages in the process of making decisions that appear to favor some and disfavor others. Sentencing provides a prime example. Similarly situated defendants rarely receive precisely the same sentence, although Congress has endeavored to achieve uniformity through the Sentencing Guidelines. The judiciary also determines whether laws and rules are to be applied retroactively or merely prospectively. Prisoners on death row tell of the inequality they perceive from those judicial decisions. The executive branch dispenses preferential treatment in the eyes of a citizen charged with a crime when the government fails to prosecute another citizen allegedly guilty of the same crime.

In all, our government, falling short of the utopia that we might hope for, can only strive for equality in classifications. But it would be unrealistic for us to expect perfect equality.

This is not to say that we are undisturbed by the methodology employed by Congress in its dispensation of transitional relief. We would be less than candid if we did not confess that we are somewhat troubled, if not astonished, that political connections played such a large role in the creation of this *ad hoc* tax legislation. But as members of the judiciary, we "may not sit as a superlegislature to judge the wisdom or desirability of

legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Dukes,* 96 S.Ct. at 2517.  Nor do we write on a clean jurisprudential slate. We may not apply a more rigorous scrutiny to this *ad hoc* tax legislation than the Supreme Court prescribes, even though "[t]he very existence of such legislation suggests that the legislative process has been subverted to serve purely private ends."  Zelenak, *supra* note 2, 44 Tax L.Rev. at 581.

We conclude that the Supreme Court would not likely condemn the transition rules, but would find instead that these "statutory classification are sufficiently justified as being the outcome of a power struggle among competing private interests."  *Id.* at 569 (citing Posner, *The DeFunis Case and the Constitutionality of Preferential Treatment of Racial Minorities,* 1974 Sup.Ct.Rev. 1, 28).

The judgment of the district court is AFFIRMED.

E. Grady Jolly, Circuit Judge, Dissenting and Specially Concurring in the Result:[10]

Despite the majority's resourceful efforts to find standing to assert a claim for equal protection in this case, I am compelled to dissent respectfully from the majority's conclusion that the plaintiffs -- who claim no economic injury for themselves but seek

---

[10]I concur in the result reached by the majority's opinion, which determines that the plaintiffs' claim fails on the merits.

only to deny economic benefits to others -- have standing to bring this case.

The majority holds that the plaintiffs have standing to pursue their claims under the equal protection component of the Due Process Clause of the Fifth Amendment. Standing to assert such a claim requires that the plaintiff be harmed as a member of an injured class that can be given a lawfully cognizable definition. I fail to see that the transition rules created a "class" as the term is applied to equal protection of the laws. A traditional equal protection class is defined by some characteristic of the persons disfavored, such as race, state residence, age, legitimacy, or even holding later-acquiring property. *See, e.g.,* Williams v. Vermont, 472 U.S. 14 (1985). In each such case, the plaintiff class is defined by the characteristics of the class that form the basis of discrimination and injury, such as illegitimate persons who are prevented from receiving an inheritance or qualified black persons who are prevented from voting.

The plaintiff class as defined in the majority opinion appears to be those taxpayers who were not afforded relief under the transition rules. This class would even include those taxpayers who have personal and political influence in Congress but, who, in their lobbying efforts, were unsuccessful in securing a transition rule for themselves. Thus, the disfavored plaintiff class is all taxpayers in the United States except those successful in obtaining a transition rule benefit. This alleged affected class is so amorphous, so generalized, and so totally lacking in a common identifiable grievance as to be legally non-cognizable.

The majority would argue that this view ignores the nature of the equal protection _injury_ that the plaintiffs assert -- the "disparity in treatment" that can be remedied by the "satisfaction of knowing that the Tax Reform Act treats no one any better than them..." _Apache Bend_ ___ F.2d ___, ___ [manuscript, p.6] This injury is one that apparently every taxpayer in the country suffered. If this is a constitutionally cognizable injury under the equal protection requirement, then the taxpayers of this country suffer a judicially redressible injury each time Congress passes a bill granting benefits to some but not to all. No court has ever gone to this extreme that the majority now pioneers.

Failing to recognize the limits of the case, the majority cites _Heckler v. Mathews_, 465 U.S. 728 (1984). Although the case supports the view that lost economic benefit is not required in order to suffer an injury, and that unequal treatment alone may constitute such an injury, the discriminatory effect described by Justice Brennan in _Mathews_ is not the character of discrimination described by the plaintiffs in our case. The discriminatory effect, _i.e.,_ the injury, that gives rise to a claim of equal protection is discrimination that

> by perpetuating `archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.

_Mathews_, 465 U.S. at 739-740 _quoting_ _Mississippi University for Women v. Hogan_, 458 U.S. 718, 725 (1982).

The plaintiffs suggest that the noneconomic injury they suffer

as members of the disfavored class can be remedied with a judicial order that the Tax Reform Act treat no one better than them.  Thus, their only injury is the burden of the knowledge that other people are treated more favorably; in short, suffering envy is their injury.  The plaintiffs do not allege that their "burden" is widely shared, or known, by other citizens, nor can they allege that this burden perpetuates an "archaic" "stigma" that identifies the plaintiffs as belonging to a class of "less worthy participants in the political community."  The plaintiffs do not and cannot claim to be stigmatized by obscure tax laws.  Simply, the injury described by the plaintiffs is an injury beyond the scope of allowable injury described by the Mathews court.[11]  *See* Biszko v. RIHT Financial Corp., 758 F.2d 769, 773 (1st Cir. 1985).

Giving to it a dressed up face, the plaintiffs' injury is only an "abstract injury in nonobservance of the Constitution" by the government, or its failure to "be administered according to law."  Such injuries may not form the basis of standing in our courts.  *See, e.g.* Allen, 468 U.S. at 754; Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 482, 485 (1982) *citing* Schelsinger v. Reservists Committee to Stop the War, 418 U.S. 208 (1974).  The plaintiffs have, at best, alleged a "personal injury as a consequence of the alleged

---

[11]The majority relies greatly upon the work of Professor Lawrence Zelanak, in his article, *Are Rifle Shot Rules and Other Ad Hoc Legislation Constitutional?,* 44 Tax L.Rev. 563 (1989).  Even Professor Zelanak, as the majority notes, does not consider Mathews to extend noneconomic injury as far the majority would have it reach for the purposes of standing.  *See* Apache Bend Apts. v. United States, ___ F.2d ___, ___, n. 5; Zelanak, *Rifle Shots*, 44 Tax L.Rev. at 619.

constitutional error," which is not more than "the psychological consequence presumably produced by the observation of conduct with which one disagrees." <u>Valley Forge</u>, 454 U.S. at 486.

Because the plaintiffs have not alleged an injury under the equal protection requirement, I respectfully dissent from the majority's recognition of the plaintiffs' standing to maintain this action.[12]

---

[12]Because the majority does not reach the arguments presented concerning taxpayer standing under <u>Flast v. Cohen</u>, 392 U.S. 83 (1968), and the uniformity clause, I find it unnecessary to address these issues.